JOURNAL ENTRY and OPINION
{¶ 1} Plaintiff-appellant, Brown, Gibbons, Lang Co., L.P. ("BGL"), appeals from common pleas court orders granting judgment for the defendants, Glenn Pollack, William Vogelgesang, Candlewood Partners, Inc., Candlewood Partners, LLC, and Raymond A. Lancaster on both the complaint and the counterclaim. Appellant raises nine assignments of error as set forth in the attached appendix.
 {¶ 2} We find that the common pleas court erred by granting judgment for the defendants on the counterclaim. Therefore, we reverse that judgment and enter judgment for BGL on the counterclaim. Otherwise, we find no error in the proceedings below and affirm the common pleas court's decisions.
 Facts {¶ 3} The following facts are undisputed.
 {¶ 4} On December 5, 2000, NCS Healthcare, Inc. ("NCS") entered into an agreement with BGL for BGL to advise NCS "on its strategic alternatives, which shall include the sale, refinancing, recapitalization or restructuring of [NCS]." Under the terms of this agreement, "BGL's agency on behalf of [NCS] shall continue until the completion of a Sale Transaction or a Settlement,[1] unless earlier terminated pursuant to paragraph 7 below." Paragraph 7 permitted either party to "terminate this engagement at any time without cause by giving the other party at least 10 business days prior written notice of termination."
July 1, 2001 Agreement Among BGL, Vogelgesang, Pollack and CandlewoodPartners, Inc.
 {¶ 5} Two of BGL's partners, defendants Vogelgesang and Pollack, resigned effective July 1, 2001, and advised BGL that they would be forming Candlewood Partners, Inc. BGL, Pollack, Vogelgesang, and Candlewood entered into a contract, one of the premises of which was that "certain pending BGL transactions * * * require cooperation between Pollack, Vogelgesang, Candlewood and BGL for their successful completion and the parties hereto desire to set forth the parameters of such cooperation, as well as the division of Revenues," which were defined to include "retainers (`Retainers') received, prepaid Retainers when and if earned, and transaction success fees (`Success Fees') * * *." The contract defined Pollack and Vogelgesang collectively as "VogelgesangP-ollack."
 {¶ 6} Paragraph 2(a) of the July 1, 2001 agreement provides:
 {¶ 7} "As partial consideration for Vogelgesang-Pollack entering into this Agreement, and to maximize the value provided to BGL clients being serviced by BGL and Vogelgesang-Pollack at the time of their resignation, Vogelgesang-Pollack agree that they shall work cooperatively with BGL to complete the following pending transactions (the `V-P Transactions') and the parties shall divide Revenues received subsequent to June 30, 2001 from such transactions as follows:

"Transaction Revenue Split (BGL/V-P)
" * * * * * *
"NCS Healthcare 65%/35%
" * * * * * *"
 {¶ 8} Vogelgesang and Pollack agreed that they would serve as consultants to BGL with respect to the V-P Transactions, under the supervision of a BGL partner, and that they would act as the "lead investment banker (`Lead Banker') responsible for managing the V-P Transaction to closing." BGL was given the right to assume the role of lead banker for a transaction if Vogelgesang and Pollack failed in any material manner to perform their duties to process a transaction for which they were the lead banker, or if the client expressed dissatisfaction with their performance in writing. In that event, Vogelgesang and Pollack's percentage of revenues from the transaction would be "reduced by fifty percent."
 {¶ 9} Finally, at paragraph 11 of the agreement, the parties agreed:
 {¶ 10} "Vogelgesang-Pollack and Candlewood agree that, for a period of two (2) years from the effective date of this Agreement, they will not request or advise any person * * * having current business dealings with BGL to withdraw, curtail or cancel such business or business dealings or solicit any person * * * that was a BGL client or customer at any time during the period beginning January 1, 1997 and ending July 1, 2001 * * *" with certain exceptions not applicable here.
July 25, 2002 Modification of NCS/BGL Agreement.
 {¶ 11} On July 25, 2002, NCS and BGL modified their December 2000 agreement. This modification relieved BGL of any obligation "to render or provide any advice or assistance to [NCS] pursuant to the Agreement." However, NCS agreed that it would not terminate the December 2000 agreement before November 1, 2002 and would not "terminate or seek to terminate the Agreement for cause based exclusively on information available to and known by [NCS at] the time of execution of this Modification by [NCS]." BGL consented to NCS's engagement of Candlewood Partners Inc. to provide a fairness opinion with respect to a proposed sale and to act as NCS's financial advisor.
July 26, 2002 Agreement between NCS and Candlewood Partners LLC.
 {¶ 12} The day after NCS and BGL agreed upon this modification, NCS and Candlewood Partners LLC entered into an agreement for Candlewood to serve as financial advisor to NCS in connection with a possible business combination.
October 16, 2002 Termination Letter.
 {¶ 13} On October 16, 2002, NCS sent a letter to BGL providing notice, pursuant to paragraph 7 of the December 2000 agreement, that NCS was terminating BGL's engagement effective November 1, 2002.
December 17, 2002 Agreement between NCS and Candlewood Partners LLC
 {¶ 14} On December 17, 2002, NCS and Candlewood Partners LLC entered into a new agreement pursuant to which NCS retained Candlewood to serve as its financial advisor. Among other things, this agreement provided that NCS would pay Candlewood a fee of $500,000 promptly after Candlewood advised the board as to the fairness of a transaction, and in addition would pay Candlewood a fee of $3,500,000. Candlewood acknowledged receipt of $4 million in fees from NCS that same day. BGL demanded 65% of this fee in a letter dated December 30, 2002.
Procedural History
 {¶ 15} The complaint in this case was originally filed on January 13, 2003, and was amended with leave of court on April 23, 2003. The amended complaint asserted that the fees Candlewood Partners LLC were to receive from NCS pursuant to the July 26, 2002 agreement were "revenues" subject to division pursuant to the July 1, 2001 agreement between BGL, Vogelgesang, Pollack, and Candlewood Partners, Inc.
 {¶ 16} The amended complaint further alleged that NCS entered into a merger agreement with Omnicare, Inc. on December 17, 2002, and on that same date, also entered into a new agreement with Candlewood Partners LLC in which NCS agreed to pay Candlewood "success fees" totaling $4 million. BGL contended that it was entitled to 65% of this amount.
 {¶ 17} BGL claimed that Pollack, Vogelgesang and Candlewood Partners, Inc. breached the July 1, 2001 agreement by failing to pay BGL its portions of the retainers and "success fees" which NCS paid to Candlewood Partners LLC. BGL also asserted that these defendants breached the July 1, 2001 agreement by soliciting NCS to provide it with financial advisory services within the two year period during which they were prohibited from doing so.
 {¶ 18} BGL further claimed that the defendants were all unjustly enriched by work product BGL had developed for NCS and which they used during their engagement by NCS without compensating BGL. It claimed the defendants were also unjustly enriched when another client, Lazy Days' R.V. Super Center, reimbursed the defendants for expenses that had been incurred by BGL.
 {¶ 19} The third count of the complaint asserted that Pollack, Vogelgesang and Candlewood Partners, Inc. converted monies which they had received from NCS and Lazy Days on behalf of BGL. Counts four and five claimed that these defendants fraudulently transferred their right to receive revenue from NCS to Candlewood Partners LLC. Count six contended that they fraudulently failed to disclose the existence of Candlewood Partners LLC at the time they were negotiating the July 1, 2001 agreement, with the intent of avoiding the division of revenues with BGL.
 {¶ 20} Defendants answered and counterclaimed for an accounting of revenues BGL received that were subject to the July 1, 2001 agreement.
 {¶ 21} Defendants then moved for summary judgment on the complaint, and BGL moved for partial summary judgment on its claims for breach of contract, conversion and unjust enrichment. The court granted judgment for the defendants on all of the claims relating to NCS in the complaint, holding that the July 1, 2001 agreement "does not cover the situation where a party is discharged by a client for cause." The court further determined that there was no evidence that defendants solicited NCS; rather, "Candlewood merely continued work it was already doing under the BGL contract." The court "dismissed" plaintiff's claims for breach of contract, unjust enrichment, conversion and statutory and common law fraud, but noted that "[t]he remaining claim concerning Lazy Days has not been argued or briefed," and referred that claim to arbitration. BGL subsequently dismissed "any remaining unresolved claims" without prejudice.
 {¶ 22} BGL filed a notice of appeal from the court's ruling, but the appeal was dismissed for lack of a final order. The counterclaim was later scheduled for trial on August 23, 2004. On December 28, 2004, the court entered judgment "for plaintiff in the amount of $63,535.32." The successor judge vacated this order pursuant to Civ.R. 60(A) "due to clerical mistake" on January 7, 2005, and entered judgment for defendants-counterclaimants in the amount of $63,535.32. This appeal followed.
 Law and Analysis Motion to Correct the Record.
 {¶ 23} Initially, appellees have moved this court to correct the record to include a May 5, 2003 letter which counsel for all parties submitted to the trial court. The letter asks the court to reinstate a previously imposed briefing schedule for dispositive motions and confirms that "counsel believe that all or most of the issues can be decided by summary judgment." Appellees argue that this letter rebuts appellant's contention that there is no evidence of an agreement among counsel that all the issues were legal in nature and should be resolved by summary judgment. The trial court cited such an agreement by counsel at a July 15, 2003 pretrial as a reason to conclude that no genuine issue of material fact existed.
 {¶ 24} The purpose of a motion to correct the record is to ensure that "the record truly discloses what occurred in the trial court." App.R. 9(E). The joint letter which appellees seek to include in the record predates the pretrial to which the court referred in its order granting summary judgment. It also predates the parties' motions for summary judgment. The letter does not correct the absence of any record of the pretrial. Therefore, the motion to correct the record is denied.
Summary Judgment on the Complaint.
 {¶ 25} We review the trial court's order granting summary judgment de novo, applying the same standard the trial court used. Comer v. Risko,106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8. Summary judgment is appropriate if there are no genuine issues as to any material fact, the moving party is entitled to judgment as a matter of law, and viewing the evidence in the light most favorable to the non-moving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party. Civ.R. 56(C).
 {¶ 26} In its third assignment of error, BGL contends that the court erred by finding that there were no genuine issues as to any material fact. BGL urges that there is a question whether NCS discharged BGL for cause.
 {¶ 27} Even if this is a disputed issue, it is not material to the outcome of this case. The December 5, 2000 agreement between NCS and BGL allowed either party to terminate the engagement at any time without cause by giving written notice at least ten business days' prior to the termination. As will be discussed more fully below, the July 1, 2001 agreement between BGL, Vogelgesang, Pollack and Candlewood Partners, Inc. presumed that NCS engaged and would continue to engage BGL; it does not address the parties' relative rights and obligations if NCS terminated its relationship with BGL. Therefore, it is immaterial whether NCS terminated BGL for cause. The third assignment of error is overruled.
 {¶ 28} BGL's second, fourth, fifth and seventh assignments of error contend that the trial court's construction of the July 1, 2001 agreement was erroneous. We agree with BGL that the terms of the July 1, 2001 agreement were unambiguous, and that construction of the unambiguous terms of a written contract is a matter of law. However, we cannot agree with BGL's assertion that the agreement required the defendants to pay BGL 65% of all revenues they received from NCS, without exception.
 {¶ 29} The July 1, 2001 agreement presupposed that BGL had been retained as financial advisor for clients involved in pending transactions. The agreement set forth the terms under which Vogelgesang and Pollack would assist and cooperate with BGL in managing the transactions for which BGL had been retained in exchange for a percentage of the revenues from them.
 {¶ 30} Once NCS terminated its engagement of BGL, there was nothing for Vogelgesang and Pollack to do under their agreement with BGL with respect to that transaction; they could not serve as consultants to or assist and cooperate with BGL on a transaction on which BGL was not engaged. The July 1, 2001 agreement did not require the defendants to share any funds Candlewood Partners LLC received from NCS pursuant to an agreement to provide financial services to NCS which they entered into after NCS terminated its relationship with BGL. Accordingly, we agree with the common pleas court that summary judgment was appropriate on BGL's breach of contract claim to the extent BGL claimed a right to a portion of the fees Candlewood received from NCS.
 {¶ 31} BGL's conversion and fraud claims depend upon a determination that BGL was entitled to a percentage of the fees the defendants received from NCS. Having found that BGL was not entitled to a percentage of those fees, the trial court properly granted summary judgment on these claims as well.
 {¶ 32} We overrule the second, fourth, fifth and seventh assignments of error.
 {¶ 33} In its first assignment of error, BGL asserts that the court erred by entering summary judgment on its claims on the ground that the July 1, 2001 agreement "does not cover the situation where a party is discharged by a client for cause." BGL argues that it was deprived of due process by the award of judgment on a ground as to which it had no notice or opportunity to be heard.
 {¶ 34} Our de novo review of the parties' summary judgment motions has rendered this assignment of error moot. We have held that NCS could discharged BGL without cause, and that the payments received by the defendants after NCS terminated its relationship with BGL were not subject to division under the July 1, 2001 agreement between BGL and the defendants. Therefore, the first assignment of error is overruled.
 {¶ 35} BGL's sixth assignment of error urges that even if summary judgment was appropriately granted on its breach of contract claim, its unjust enrichment claim is still viable. Again, we must disagree. To recover on a claim of unjust enrichment, the party asserting the claim must demonstrate that it conferred a benefit upon the recipient, the recipient had knowledge of the benefit, and it would be unjust to allow the recipient to retain the benefit without compensating the party who conferred it. Landskroner v. Landskroner, 154 Ohio App.3d 471, 490,2003-Ohio-5077. In this case, the person who benefitted from BGL's work was NCS, not the defendants. NCS is not a party to this action and is not alleged to have been unjustly enriched by BGL's work on its behalf. Even if the defendants were compensated in part for BGL's work, it was NCS (not BGL) who conferred this benefit on the defendants. BGL did not confer any benefit on the defendants, so the court properly granted summary judgment for them on this claim.
 {¶ 36} Accordingly, we affirm the common pleas court's order granting partial summary judgment for the defendants on BGL's complaint.
Counterclaim.
 {¶ 37} BGL's eighth and ninth assignments of error challenge the common pleas court's judgment on the counterclaim. BGL first asserts that the successor judge erred by sua sponte vacating the judgment for plaintiff on the counterclaim and entering judgment for the defendants. Civil Rule 60(A) allows a court to correct clerical mistakes in judgments "at any time on its own initiative * * * and after such notice, if any,
as the court orders." (Emphasis added.) In this case, the mistake in the original entry was obvious and clerical in nature. First, the caption in the original judgment entry reversed the parties' positions in this litigation, showing "Glenn Pollack, et al." as the plaintiffs and "Brown, Gibbons, Lang Co., L.P." as the defendant. At several points in the entry, the court referred to the "plaintiffs" in a way which clearly refers to Pollack, Vogelgesang, et al. The court's entry of judgment for "plaintiff," then, was consistent with the remainder of the judgment entry and clearly intended to refer to the counterclaimants, who were listed as the plaintiffs on that document.
 {¶ 38} The Civ.R. 60(A) entry was captioned to reflect the parties' actual positions in the litigation, and accordingly granted judgment for the defendants-counterclaimants, rather than the plaintiffs. We perceive no abuse of discretion in the court's sua sponte correcting the judgment entry, without hearing. Therefore, the eighth assignment of error is overruled.
 {¶ 39} Finally, BGL asserts that there is no competent credible evidence to support the trial court's determination that it owes defendants some $63,535.32. It contends that the trial court incorrectly found that BGL improperly deducted some $80,000 from the defendants share of the revenues. This $80,000 represented two months' retainers (for January and February 2002) which BGL's client, Paragon, never paid.
 {¶ 40} Paragraph 7(a) of the July 1, 2001 agreement provides that "[t]he amount of Revenues distributable to Vogelgesang-Pollack shall first be reduced by * * * (ii) any uncollectable [sic] accounts receivable and expenses with respect to the V-P Transactions, including, but not limited to, uncollected or uncollectable fees and unreimbursed direct out of pocket expenses * * * *"
 {¶ 41} Defendants contend that the $80,000 was not a charge actually due from Paragon. The trial court did not make any such finding, however. Instead, the court determined that "Paragon never paid these invoices, and BGL never sought to collect on these invoices either by formal or informal means. Repayment by [Pollack and Vogelgesang] is hence inappropriate."
 {¶ 42} The contract does not require that BGL seek to collect on the invoices to be able to "charge back" uncollected retainers to Pollack and Vogelgesang. The court therefore erred by finding that this $80,000 was improperly charged back to Pollack and Vogelgesang. Subtracting this amount from the $63,535.32 which the court found to be due from BGL to these defendants creates a negative balance. Hence, the court should have granted judgment for BGL on the counterclaim.
 {¶ 43} Accordingly, we affirm the common pleas court order granting partial summary judgment for the defendants on BGL's complaint. We reverse the judgment for the defendants on the counterclaim and enter judgment for BGL on the counterclaim.
 {¶ 44} This cause is affirmed to the extent the court granted partial summary judgment for appellant on the complaint, and reversed to the extent the court entered judgment for the appellees on the counterclaim. Judgment is entered for appellant on the counterclaim.
It is, therefore, considered that said appellant recover of said appellees its costs herein.
It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J. and Kilbane, J. concur.
 APPENDIX
I. The trial court erred to plaintiff's substantial prejudice by entering summary judgment dismissing plaintiff's contract, unjust enrichment, conversion and statutory and common law fraud claims on a ground that was neither raised nor argued in defendants' motion for summary judgment.
II. The trial court erred to plaintiff's substantial prejudice in holding — contrary to law — that plaintiff had no contract, unjust enrichment, conversion, or statutory or common law fraud claim because the agreement involved did not cover the situation where a party is discharged by a client for cause, when the agreement plainly required the parties to divide any revenues received from certain transactions withoutany exception, and defendants refused to do so.
III. The trial court erred to plaintiff's substantial prejudice in dismissing plaintiff's contract, unjust enrichment, conversion, and statutory and common law fraud claims by first finding that the parties had agreed that all the issues were legal issues when the record contains no such agreement, and then finding (implicitly) that plaintiff was discharged by the client for cause after construing the evidence most strongly against plaintiff, the non-movant, and resolving serious conflicts in the evidence against plaintiff, contrary to Civ.R. 54(C).
IV. The trial court erred as a matter of law to plaintiff's substantial prejudice in concluding that the agreement involved required the parties to "work cooperatively to complete" the specified transactions when paragraph 2(a) of that agreement plainly requires "[defendants] agree that they shall work cooperatively with [plaintiff] to complete [specified] transactions."
V. The trial court erred as a matter of law to plaintiff's substantial prejudice in concluding that there was no provision "anywhere in this agreement as to what should occur if either [plaintiff] or [defendants] [were] discharged by the client for cause" when the agreement clearly requires the revenues be divided with plaintiff without exception, but states that defendant's share "shall be reduced by 50%" if the client was "dissatisfied with [defendants'] performance."
VI. The trial court erred as a matter of law to plaintiff's substantial prejudice in dismissing plaintiff's unjust enrichment claim if the contract at issue did not cover the situation where a client discharges a party for cause.
VII. The trial court erred to plaintiff's substantial prejudice by failing to grant the plaintiff's motion for partial summary judgment as to defendants' liability for breach of contract and conversion when, as a matter of law, the plain terms of the agreement at issue required defendants to pay plaintiff 65% of the revenues defendants received from NCS, without any exception, there was no genuine issue as to any material fact with respect thereto, and viewing the evidence most strongly in favor of defendants, reasonable minds could come to only one conclusion, and that conclusion is adverse to defendants.
VIII. The successor judge erred to Brown Gibbons' substantial prejudice by sua sponte vacating the judgment entered by the trial judge for plaintiff on the counterclaim and then entering judgment for defendants thereon, without any notice to the parties or any opportunity to be heard, and without reviewing the trial transcript.
IX. The successor judge erred to plaintiff's substantial prejudice in entering judgment for defendants for $63,535.32 on the counterclaim when the judgment is not supported by competent and credible evidence.
[1] "Sale Transaction" is defined by the contract as a sale or other transfer of all or a substantial part of NCS's assets. A "Settlement" is a compromise or restructuring of NCS's debt.